# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2482

_____

Dillard's Inc., Individually and as   *
Assignee of Janet Bolton,      *
            *
    Plaintiff/Appellee,    *
            *
   v.          *
            *
Liberty Life Assurance Company of   *
Boston, a Member of the Liberty    *
Mutual Group,         *   Appeals from the United States
            *   District Court for the
    Defendant/Appellant.   *   Eastern District of Arkansas.
            *
_____     *
            *
            *
Liberty Life Assurance Company of   *
Boston,           *
            *
    Third Party Plaintiff/    *
    Appellant,       *
            *
   v.          *
            *
Janet Bolton,         *
            *
    Third Party Defendant/   *
    Appellee.        *

_____

No. 05-2517

_____

Dillard's Inc., Individually and as     *
Assignee of Janet Bolton,     *
     *
     Plaintiff,     *
     *
     v.     *
     *
Liberty Life Assurance Company of     *
Boston, a Member of the Liberty     *
Mutual Group,     *
     *
     Defendant/Appellee.     *
     *
_____     *
     *
     *
Liberty Life Assurance Company of     *
Boston,     *
     *
     Third Party Plaintiff/     *
     Appellee,     *
     *
     v.     *
     *
Janet Bolton,     *
     *
     Third Party Defendant/     *
     Appellant.     *

_____

Submitted: March 17, 2006
Filed: July 19, 2006

_____

Before WOLLMAN and RILEY, Circuit Judges, and ROSENBAUM,[1] District Judge.
_____

WOLLMAN, Circuit Judge.

Liberty Life Assurance Co. of Boston (Liberty) appeals from the district court's grant of judgment on the pleadings for Dillard's, Inc. (Dillard's) in an Employee Retirement Income Security Act (ERISA) claim brought by Dillard's on behalf of itself and as assignee of Janet Bolton. Bolton cross-appeals from the district court's judgment awarding Liberty reimbursement of overpayments resulting from her receipt of social security disability benefits. We affirm on Bolton's cross-appeal, reverse on Dillard's ERISA claim, and remand the case to the district court with directions that the ERISA complaint be dismissed.

## I.

From 1980 to 2000, Bolton worked at Dillard's as vice president of corporate advertising. She was responsible for making all managerial decisions for the corporate advertising department, including decisions regarding catalog advertisement, television advertisement, and the corporate advertising catalog. She also acted as the corporate director of all divisional and corporate catalogs, direct mail, statement enclosures, magazine advertisements, corporate gift wrap, logos, and special events. Bolton maintained this position until August 7, 2000, when her primary care physician, Charles B. Barg, M.D., recommended that she terminate her employment because of her severe fatigue and uncontrolled hypertension (high blood pressure). Dr. Barg stated that this hypertensive crisis exacerbated Bolton's fibromuscular

_____

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

dysplasia (FMD)[2] symptoms and that he was attempting to bring her blood pressure under control and deal with her fatigue, which was unchanged.

Bolton had suffered from symptoms related to hypertension and FMD since 1992. FMD is a disease of the blood vessels that causes stenoses and aneurysms. It most often affects the kidney arteries, and its cause is unknown. FMD can lead to high blood pressure and stroke, and shrinkage of the kidney is also often present in FMD patients. Hypertension is a condition in which there is a rise in systemic blood pressure as a result of stenosis of one or more arteries or their branches. It may be caused, at least in part, by FMD. A patient may have high blood pressure and FMD, however, even if the high blood pressure is not caused by FMD. An angioplasty is the preferred and usual treatment for FMD patients. Hypertension may be treated, in part, by stress reduction. Between 1992 and 2000, Bolton underwent four angioplasties to treat her hypertension and FMD. She is not a candidate for further angioplasty, as such a procedure would be dangerous to her health.

Bolton was covered under an employer-sponsored long-term disability plan issued by Liberty. The plan provides that a claimant is eligible for long-term disability benefits if she proves that she is "unable to perform all of the material and substantial duties of [her] occupation on an Active Employment basis because of an Injury or Sickness." J.A. at 32. When applicable, the proof must cover the date, cause, and degree of disability or partial disability. Further, the plan provides that Liberty is entitled to periodically require proof of continued disability, and Liberty, at its own expense, has the right and opportunity to have the claimant examined by a physician or vocational expert of its choice.

---

[2]Dr. Barg's note actually stated that Bolton's hypertensive crisis had "exacerbated her fibromuscular *dysphagia* symptoms." J.A. at 205 (emphasis added). Because all parties agree that Dr. Barg took Bolton out of work because of hypertension and FMD, we assume that this was a typographical error.

On December 15, 2000, Bolton filed a claim for long-term disability benefits. In support of her claim, Bolton provided Liberty with a statement from her nephrologist, Gregory S. Bienvenu, M.D., who diagnosed her as suffering from hypertension and FMD. He classified her physical impairment as Class 3, indicating that Bolton had a slight limitation of functional capacity and that she was capable of light work. He also classified her mental/nervous impairment as Class 3, indicating that Bolton was capable of engaging in only limited stressful situations and limited interpersonal relations.

Marianne Wicker, a nurse in Liberty's managed disability services department, initially reviewed Bolton's claim. On February 28, 2001, Nurse Wicker noted that Bolton had been diagnosed as having FMD for eight years, that Bolton stated that her blood pressure was unstable, and that only since August 8, 2000—the alleged date of disability—had Bolton's symptoms allegedly become so severe that she was unable to work. Nurse Wicker also noted that the medical information with which Bolton provided her supported her off-work status, but that no medical documentation indicated that this status was appropriate. For example, Bolton's physicians had not filled out restrictions or physical capacities forms to support her claim, and there was no current treatment plan for Bolton. According to Nurse Wicker's notes, Bolton's off-work status was also difficult to support because it was unclear what had caused Bolton to suddenly become unable to continue in her position at Dillard's.

In response to Nurse Wicker's inquiry regarding the cause of Bolton's sudden inability to work, Bolton stated that there was no one precipitating event but that she had reached a point at which she was constantly fatigued, and her blood pressure had become more difficult to control. At this point, Nurse Wicker advised Edaleen Luther, Liberty's certified case manager, that Bolton's file contained enough medical evidence and subjective information to support Bolton's off-work status. She also stated that, for completeness, she would like to contact Bolton's primary care physicians to verify what Bolton had relayed to her.

On March 5, 2001, Nurse Wicker noted that the objective information in Bolton's file supported her off-work status at that time. On that same day, Dr. Barg's nurse confirmed what Bolton had previously told Nurse Wicker. On March 6, 2001, Dr. Barg sent a letter to Liberty stating that as of August 8, 2000, Bolton was taken out of work because of severe fatigue and uncontrolled hypertension. Nurse Wicker then concluded that Bolton's condition was chronic and had the potential to be very dangerous if left untreated. She stated that taking Bolton out of work helped to control Bolton's hypertension and fatigue and would allow Bolton to avoid having an emergency angiogram. Further, she noted that it was becoming dangerous to continue performing these procedures on Bolton.

Based on all of this information, Liberty's disability case manager, Dawn Ratliff, recommended that Liberty approve Bolton's claim for one year and recommended a follow-up review in eight months to examine new medical documentation to determine whether further benefits were warranted. Ratliff's supervisor agreed, and on March 9, 2001, Liberty notified Bolton that her claim had been approved.

A little over eight months later, Ratliff contacted Dr. Barg's office to request Bolton's updated medical records. After receiving the requested records, Ratliff referred Bolton's file to Liberty's managed care department for insight into Bolton's treatment and to assess whether a peer review of Bolton's file would be appropriate. On February 20, 2002, Nurse Wicker noted that the objective medical documentation continued to show that Bolton did better when she did not have stress in her life and when her blood pressure remained under control. She further stated that the barrier to Bolton's return to work continued to be the fact that Bolton had much better control of her blood pressure and stress when she was not working. On February 21, 2002, Nurse Wicker recorded Bolton's statement that her doctor had told her that he was primarily concerned about the diastolic number of her blood pressure and that it should remain below ninety.

Liberty determined that a peer review was appropriate and requested that Elizabeth M. Gallup, M.D., review Bolton's file and issue a report. Dr. Gallup concluded that there was no documented medical evidence that supported a degree of impairment precluding Bolton from continuing as vice president of corporate advertising at Dillard's. Although Dr. Gallup did not question whether Bolton had FMD and recognized that Bolton had undergone several angioplasties and was not a candidate for further angioplasty, she stated that she could find no medical documentation indicating that Bolton was in fact disabled by hypertension at the time of her alleged date of disability or during the year prior to or following that date. She also stated that Bolton's renal functions were stable and that her underlying renal disease had been stable for the past eight years.

Liberty then opted to obtain an independent physician review of Bolton's claim by Sorin Vainer, M.D., F.A.C.P., assistant clinical professor of medicine at the Medical College of Georgia. Dr. Vainer determined that Bolton's records demonstrated that Bolton's renal functions had been stable for the past eight years and that her blood pressure was well controlled on angiosensitive inhibitors. He noted that Bolton had claimed that her blood pressure became elevated at work, but he determined that no documentation was available to support this claim. Dr. Vainer advised that Bolton could return to work, at least on a partial basis, and that she could tolerate at least a mild to moderate level of stress, provided that she was carefully monitored.

Based on Dr. Gallup's and Dr. Vainer's recommendations, Liberty denied Bolton's claim on April 5, 2002. Bolton was advised of Liberty's grounds for denial, including the fact that her blood pressure had remained normal, that her kidney functions were nonprogressive and stable, and that she had normal renin levels. Bolton was also advised of her appeal rights, including her right to include with her appeal documentation supporting her claim.

Bolton appealed on or about April 10, 2002, but she did not submit any additional documentation in support of her claim. Liberty denied the appeal on April 19, 2002, and advised Bolton that she had exhausted her administrative rights of review.

Liberty had advised Bolton throughout its review of her claim that she might be eligible to receive social security disability benefits. Liberty assisted Bolton with this process, which was in Liberty's interest because social security disability benefits constituted "other income" deducted from the amount of disability to which Bolton was entitled under the plan. On August 28, 2002, the Social Security Administration determined that Bolton was entitled to social security disability benefits and commenced paying her accordingly.

Subsequently, Dillard's, on behalf of itself and as assignee of Bolton, filed a claim under ERISA, seeking judicial review of Liberty's decision to terminate payment of Bolton's long-term disability benefits. Liberty then moved for judgment on the pleadings. Applying an abuse of discretion standard of review, the district court concluded that no medical records indicated that Bolton would not be exposed to the same risks that necessitated her leaving Dillard's if she returned to her position as vice president of corporate advertising. Accordingly, the district court determined that Liberty's decision to terminate Bolton's benefits was arbitrary and capricious. The district court found in favor of Liberty on its third-party complaint against Bolton for equitable relief in the form of reimbursement of overpayments resulting from Bolton's receipt of social security disability benefits.

## II.

We review *de novo* the district court's grant of judgment on the pleadings. Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002). Judgment on the pleadings is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Id. We accept as true all facts pleaded by the nonmoving party, and we grant all reasonable inferences from the pleadings in favor of the nonmoving party. Id.

The parties agree that the abuse of discretion standard applies in determining whether Liberty erroneously terminated Bolton's long-term disability benefits. Under this standard, Liberty's decision need be only reasonable, meaning that it must be supported by substantial evidence. Jackson v. Metro. Life Ins. Co., 303 F.3d 884, 887 (8th Cir. 2002). A court, however, may not substitute its own judgment for that of the decisionmaker. Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 807 (8th Cir. 2002). We reverse the plan administrator's decision only if it was arbitrary and capricious. Groves v. Metro. Life Ins. Co., 438 F.3d 872, 874 (8th Cir. 2006).

Liberty did not abuse its discretion in terminating Bolton's benefits, because substantial evidence supported its determination that Bolton was not disabled. First, medical evidence reveals that Bolton's renal disease had remained stable for eight years prior to her departure from Dillard's and that her blood pressure readings prior to her departure were within her doctor's recommended range. This evidence fails to indicate that Bolton was at a greater risk at the time of her departure than she had been during her previous eight years as vice president of corporate advertising. Second, although Dr. Barg recommended that Bolton cease working at Dillard's, Dr. Gallup concluded that no objective medical evidence supported Bolton's claim and that her FMD and hypertension did not preclude her from continuing in her position. Dillard's claims that Liberty should not have credited Dr. Gallup's analysis over Dr. Barg's conclusions because Dr. Gallup did not physically examine Bolton. We have held,

however, that a plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial. Johnson v. Metro. Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2006); Coker v. Metro. Life Ins. Co., 281 F.3d 793, 799 (8th Cir. 2002).

Further, reasonable minds could conclude that Dr. Bienvenu's and Dr. Vainer's conclusions do not support Bolton's claim for benefits. As recounted above, Dr. Bienvenu opined that Bolton had only a slight limitation of functional capacity and could engage in limited stressful situations. First, there is no evidence that Bolton's occupation was physically demanding. Second, because Dr. Bienvenu did not speculate as to whether Bolton's job was so stressful such that she could not perform all of the material and substantial duties of her position, his opinion does not unequivocally support the conclusion that Bolton was disabled within the meaning of her benefits plan. Additionally, as recounted above, Dr. Vainer concluded that Bolton could return to work, but suggested that this might be only on a partial basis. He, too, concluded that Bolton could tolerate a moderate level of stress, but did not opine whether this would preclude her from performing all of the material and substantial duties of her position. Dr. Vainer's opinion, then, also does not compel the conclusion that Bolton was disabled.

Dillard's emphasizes the fact that Nurse Wicker noted that Bolton's file supported her off-work status and that Liberty initially granted Bolton's claim for benefits. Indeed, in the absence of a significant change in the information available to it, a plan administrator's "previous payment of benefits is a circumstance that must weigh against the propriety of an [administrator's] decision to discontinue those payments." McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002). The information available to Liberty changed significantly between the time it granted benefits to Bolton and when it discontinued those benefits. Liberty's initial grant of benefits was based only on Dr. Bienvenu's diagnosis that Bolton suffered from FMD

-10-

and hypertension, Dr. Barg's letter stating that Bolton was taken out of work because of severe fatigue and uncontrolled hypertension, and other information provided by Bolton, herself. Further, Liberty conditioned the continuation of benefits on its receiving updated medical reports in eight months. Between the time it granted benefits and when it terminated them, Liberty had requested that two consulting physicians review Bolton's medical records. One of these physicians determined that Bolton was not disabled and that she could return to her previous position. This determination constituted a significant change in the information available to Liberty and supported a determination that Bolton was not disabled. Accordingly, Liberty's initial grant of benefits did not preclude it from later terminating Bolton's benefits.

## III.

In her cross-appeal, Bolton contends that the district court erred in awarding Liberty reimbursement of overpayments resulting from her receipt of social security disability benefits. She argues that the only assessment that the district court should have made was a set-off against the award for unpaid disability benefits. Because we have determined that Liberty is not responsible for further payment of benefits, Bolton's argument fails.

Additionally, in a letter submitted to us under Federal Rule of Appellate Procedure 28(j), Bolton also argues that the district court lacked subject matter jurisdiction to award Liberty reimbursement for overpayments made to Bolton. Specifically, Bolton contends that Liberty did not seek equitable relief but instead sought monetary damages, which are disallowed in a civil action by a plan administrator under ERISA. We disagree.

The Supreme Court addressed a similar issue in Sereboff v. Mid Atlantic Medical Services, Inc., 126 S. Ct. 1869 (2006). In that case, an ERISA fiduciary brought suit against plan beneficiaries, seeking reimbursement under the plan's third-

party reimbursement provision for amounts paid by the health insurance plan and subsequently recovered by the beneficiaries in their settlement with third-party tortfeasors. Id. at 1872-73. The beneficiaries argued that the fiduciary's claim for relief was not equitable and thus disallowed under ERISA. See id. at 1873-77. The Supreme Court disagreed, holding that the fiduciary's action to enforce the third-party reimbursement provision "qualifie[d] as an equitable remedy because it [was] indistinguishable from an action to enforce an equitable lien established by agreement." Id. at 1877. Central to its holding was the Supreme Court's determination that the third-party reimbursement provision "specifically identified a particular fund, distinct from the [beneficiaries'] general assets—all recoveries from a third party . . . —and a particular share of that fund to which [the fiduciary] was entitled—that portion of the total recovery which [was] due [the fiduciary] for benefits paid." Id. at 1875 (internal quotations, citations, and alterations omitted).

The present case is analogous to Sereboff in that Liberty seeks reimbursement for amounts paid to Bolton from a third-party source, the Social Security Administration. Liberty's complaint states that it is a request for equitable relief, and Liberty seeks a particular share of a specifically identified fund—all overpayments resulting from the payment of social security benefits. Accordingly, Liberty's complaint constitutes a request for equitable relief, and the district court did not err in exercising subject matter jurisdiction over Liberty's third-party complaint.

We affirm the district court's judgment on reimbursement for overpayments resulting from the receipt of social security benefits. We reverse the district court's judgment that Liberty abused its discretion in terminating Bolton's disability benefits and remand the case to the district court with directions that Dillard's complaint be dismissed.

_____